## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

ANDREW KOPPERL,

    Plaintiff,

 v.

KENT S. BAIN, AUTOMOTIVE
RESTORATIONS, INC., VINTAGE
RACING SERVICES, INC., JOHN ROLLS,
and LAWRENCE A. NEVIASER,

    Defendants.

CIVIL ACTION NO.
3:09 - CV - 1754 (CSH)

**JUNE 2, 2014**

## RULING ON DEFENDANTS' MOTION TO DISMISS CERTAIN COUNTS
## OF PLAINTIFF'S THIRD AMENDED COMPLAINT

**HAIGHT, Senior District Judge:**

This diversity action arises out of the parties' participation in an automotive business venture that began in seeming harmony but collapsed in mutual recrimination.  A detailed recitation of the case's factual background appears in the Court's prior Ruling reported at 2010 WL 3490980 (D. Conn. Aug. 30, 2010) ("*Kopperl I*"), familiarity with which is assumed.

The operative pleading is Plaintiff Kopperl's Third Amended Complaint [Doc. 29] ("TAC"). The TAC alleges nineteen separate counts against various parties defendant.  Defendants have filed a motion [Doc. 36] to dismiss the Third through the Nineteenth Counts, on various theories.  While they deny any ultimate liability, Defendants do not move to dismiss the First and Second Counts of the TAC.

1

## I.  BACKGROUND

That distinction is important because it affects the Court's analysis of the remaining counts, which Defendants do move to dismiss.  Without recounting the full factual background, it is sufficient for present purposes to say that the principal gravamen of Kopperl's complaint is the allegedly wrongful failure of Defendant Bain to convey to Kopperl specified percentages of Bain's ownership interest in the corporate defendants, Automotive Restorations, Inc. ("ARI") and Vintage Racing Services, Inc. ("VRS").

Thus, the First Count of the TAC, for injunctive relief, prays for "a mandatory injunction ordering Bain, ARI, and VRS, to reflect Kopperl's ownership interests of 47.5% in ARI and 40% in VRS on the books and records of ARI and of VRS, respectively, and to issue stock certificates to Kopperl reflecting Kopperl's ownership interests in ARI and in VRS."  TAC, page 13, ¶ 62.  That requested relief is echoed in ¶ 1 of the TAC's demand for judgment, at page 33.

The Second Count, which prays for declaratory relief, identifies the underlying dispute as having arisen "between Kopperl and Bain as to Kopperl's ownership of a 47.5% ownership interest in ARI and a 40% ownership interest in VRS."  TAC, page 14, ¶ 62.[1]  The TAC's demands for judgment, at page 33, include at ¶ 2: "A judgment declaring that Kopperl is the owner of a 47.5% stock ownership interest in ARI and a 40% stock ownership interest in VRS."

## II.  DISCUSSION

Two questions are presented by Defendants' motion to dismiss.  The first relates to damages

---

[1]    The quoted paragraph number, 62, is the same as that quoted from the First Count, because throughout the pleading Plaintiff introduces each Count in the TAC with incorporations by reference of ¶¶ 1-61, and then starts renumbering from that point.

as a question of pleading.  The second relates to liability as a question of substantive law.  I discuss these in order.

## A.    Damages as a Question of Pleading

The succeeding counts, Third through Nineteenth, are summarized in *Kopperl I*, 2010 WL 3490980.  A recurrent theme runs through them.  It is that as the result of the particular wrongful conduct alleged, Kopperl "suffered damages."  The nature and amount of those damages are not alleged.  The Third Count is illustrative.  It alleges a claim for fraudulent misrepresentation, arising out of Bain's "repeated representations to Kopperl that Kopperl would have, and did have, a 47.5% ownership interest in ARI and a 40% ownership interest in VRS."  TAC, p. 14,  ¶ 62.  The Count concludes with the allegation: "As a result of Kopperl's reliance on Bain's misrepresentations, and as a result of Bain's fraudulent acts, Kopperl has suffered damages."  *Id.*, ¶ 70.  The Third Count contains no further allegations describing the nature or amount of those "damages": an omission shared by the other succeeding Counts.

Those allegations of damages are insufficient as a matter of law for the reasons stated in *Kopperl I*, 2010 WL 3490980, at *3-*4 and not here repeated.  That Ruling dismissed certain of Defendants' counterclaims.  Plaintiff's brief [Doc. 47] at 2 seeks to finesse the question by charging that Defendants "suddenly try to piggy-back on this ruling to make an argument that Plaintiff's claims should also be dismissed."  That is an odd and inapt expression.  The rule of pleading requiring dismissal of Defendants' counterclaims against Plaintiff applies equally to Plaintiff's claims against Defendants.  Defendants' invocation of the rule, now that the shoe is on the other foot, is not piggy-backing; it is a request for an equal and uniform application of a rule of law.

Plaintiff's more substantive contention is that the TAC satisfies the damages-pleading rule because, in contrast to the dismissed counterclaims, his allegations "are factual, non-conclusory, and Plaintiff has clearly pled actual, quantifiable and quantified damages. The damages claims are neither speculative nor hypothetical." *Id*. Plaintiff's brief then endeavors to show how each of the succeeding counts (Third through Nineteenth) satisfy that standard. What becomes apparent is Plaintiff's seemingly exclusive focus upon Bain's allegedly wrongful refusal to bestow upon Kopperl the percentage ownerships in ARI and VRS that underlie the First and Second Counts of the TAC. For example: after reviewing documents described in the complaint, Plaintiff's brief argues at 3: "All these documents support the conclusion that Plaintiff owns the amount of stock at issue in this case, and therefore these allegations demonstrate the quantum of his claim."

Plaintiff's brief can be read to contend that this theory applies to, and satisfies the damages pleading requirements of, each and every count in the TAC. If that is the fact, then the succeeding counts are duplicative of the First and Second Counts, at least with respect to damages. On the other hand, if Plaintiff means his references to "damages" in those later counts to include losses of a nature and amount additional to and different from "the amount of stock at issue in this case" and that stock's value, his allegations are insufficient for the reasons stated in *Kopperl I*.

This issue must be clarified. That may be accomplished by reading the TAC to assert claims for damages in addition to and apart from the contested amounts of corporate stock, and dismissing the counts involved with leave to replead. If Plaintiff is claiming such additional and separate damages, he may include in a further amended complaint allegations which describe the nature of the damages and demonstrate the amount claimed. If Plaintiff chooses not to replead, the Court will infer that all the counts in the TAC have as their damages element the ownership and value of the

ARI and VRS shares to which Kopperl claims he is entitled.  In that event, questions may arise with respect to whether the succeeding counts are subject to dismissal on grounds that they duplicate the First and Second Counts, or the rule against splitting causes of action.  Those questions have not been briefed, and I intimate no present view with respect to them.

**B.      Liability as a Question of Substantive Law**

The discussion in Part II.A. is concerned with counts where the only discernible ground for dismissal is a failure to plead damages sufficiently.  Defendants move to dismiss certain counts on the additional ground that they fail to state a claim under governing substantive law.  That aspect of the motion is governed by Fed. R. Civ. P. 12(b)(6).  This Part of the Ruling considers those counts.

The counts against some Defendants or others which Defendants seek to dismiss on substantive grounds are as follows: Fourteenth (conversion); Fifteenth (statutory theft); Sixteenth (tortious interference with contractual relations); Seventeenth (tortious interference with business expectancy); and Eighteenth (civil conspiracy).  I consider those counts in order.

**1.      *Conversion***

The Fourteenth Count is captioned "Conversion of Ownership Interests as to Bain, Rolls and Neviaser."  It realleges ¶¶ 1 though 61 of the TAC, the contents of some paragraphs being factual, others conclusory or argumentative.

Paragraphs 62 to 63 allege that "[t]he conduct of Bain, Rolls, and Neviaser in depriving Kopperl of his 47.5% ownership interest in ARI and his 40 % ownership interest in VRS is unauthorized" and "has caused damage to Kopperl." Doc.  29, p. 24, ¶¶ 62-63.  Moreover, "Rolls and Neviaser knew of Kopperl's 47.5 ownership interest in ARI and 40% ownership interest in VRS

5

when they purported to acquire ownership interests in ARI and VRS from Bain, which were Kopperl's ownership interests." *Id.*, ¶ 64.   "Despite Kopperl's demand, Bain, Rolls and Neviaser have failed and refused to return Kopperl's ownership interestes in ARI and VRS to him." *Id.*, ¶ 65. Paragraphs 66 to 68 of the TAC, while also forming a part of the Fourteenth Count, are duplicative of the paragraphs I have just quoted.

The tort of *conversion* is defined as "[t]he wrongful possession or disposition of another's property as if it were one's own."[2] *Black's Law Dictionary* (9th ed. 2009).   It is a common law tort of great antiquity, having its origin in the common law action in trover, as a branch of an action on the case.  By 1554, the claim in conversion became standardized as the result of the decision in *Lord Mounteagle v. Countess of Worcester*, (1554) 2 Dyer 121a, 73 E.R. 265, where plaintiff was in possession of certain goods, casually lost them, defendant found the goods but did not return them, and was held liable because he wrongfully "converted them to his own use."[3]   Conversion is a manifestation of the cardinal sin of greed, which has plagued mankind for a long time.  A common law lawyer could argue that Eve committed the Original Tort by converting someone else's forbidden apple to her own use, thereafter persuading Adam to become a co-defendant.

Although conversion is an ancient tort, stemming from broadly stated failings of human nature, it is narrowly and precisely circumscribed by common law.  Courts continue to struggle to specify what conduct constitutes conversion and what does not.  In at least five cases decided

---

[2]   Conversion is further defined as "an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." *Black's Law Dictionary* (9th ed. 2009)

[3]   For the historical details in this paragraph, I acknowledge my debt to *Wikipedia.org* (visited May 15, 2014).

between 2000 and 2012, the Supreme Court of Connecticut found it necessary to define "conversion." Those decisions, in inverse chronological order, are: *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20 (2000); *Macomber v. Travelers Property and Casualty Corp.*, 261 Conn. 620 (2002); *Deming v. Nationwide Mutual Insurance Co.*, 279 Conn. 745 (2006); *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408 (2007); and *State v. Lavigne*, 307 Conn. 592 (2012). I must consider those decisions because Connecticut law governs the rights and obligations of the parties in this diversity case.

The plaintiff in *Hi-Ho Tower*, 255 Conn. 20 (2000), owned, operated and maintained a communications tower. Plaintiff contracted with defendant to service communications equipment for plaintiff. A time came when plaintiff permitted defendant, in exchange for a monthly usage fee, to install a community repeater at plaintiff's tower facility for use in defendant's business. Relations between the companies deteriorated into litigation involving claims and counterclaims, resolved by a jury trial.

Plaintiff claimed, *inter alia*, that defendant "converted property of the plaintiff, namely the right to use the Tower for transmission signals, to [its] own use." 255 Conn. at 45. That claim failed because, the Supreme Court held, "the jury's implicit finding, namely, that the defendant's use of the plaintiff's tower facility was authorized, is fatal to the plaintiff's cause of action for conversion and statutory theft." *Id.* at 47. Given that finding of *authorized* use, the court did not need to decide an issue implicated by the case at bar. The unsuccessful plaintiff in *Hi-Ho Tower* asserted on appeal that "the trial court improperly instructed the jury that conversion and statutory theft are limited to certain types of tangible property and to the documents evidencing intangible rights." *Id.* at 43. The Supreme Court dropped a footnote at that point in its text: "The plaintiff also claims that the trial

court improperly charged the jury regarding the definition of 'property.'  Because we conclude that

the jury's findings are fatal to the plaintiff's cause of action for conversion and statutory theft, we

need not address this issue."  *Id.* at 43 n. 12.  In often-quoted language, the court then said in text:

> In Connecticut, intangible property interests have not traditionally been subject to the tort of conversion, except for those intangible property rights evidenced in a document.

*Id.* at 44.  For that latter proposition, the court cited cases involving "conversion of trust account"

and "conversion applicable to account passbook," *id.* (citations omitted), and noted a comment to

§ 242 of the Reinstatement (Second) of Torts that "in a proper case liability for intentional

interference with some . . . kind of intangible rights may . . . be found." *Id.*  The *Hi-Ho Tower* court

continued:

> Accordingly, the plaintiff urges this court to extend the torts of conversion and statutory theft to include intangible property rights. We need not, however, resolve this question in the context of this case, because the jury's specific responses to the interrogatories submitted to it regarding the plaintiff's claim for breach of agreement conclusively demonstrate that, irrespective of the question of whether intangible property may be the subject of the torts in question, the plaintiff did not persuade the jury that the defendants' conduct was without the authorization of the plaintiff.

*Id.*

In *Macomber v. Travelers Property and Casualty Corp.*, 261 Conn. 620 (2002), the plaintiffs

were automobile accident victims who entered into structured settlements with defendant liability

insurers.  Plaintiffs brought an action, in ten substantive counts, based on defendants' conduct in

entering into and funding certain structured settlements with plaintiffs.  The trial court granted

defendants' motion to strike the complaint in its entirety, concluding that "regardless of the theory

of liability offered by the plaintiffs, all counts of their complaint must fail because they did not

8

sufficiently allege any legally cognizable damages." 261 Conn. at 623.  The Supreme Court held that

conclusion was in error, but went on to consider defendants' "alternative grounds for striking each

count of the complaint," and ultimately affirmed the dismissals in part and reversed them in part.

*Id.*

One of the counts the Supreme Court held must be stricken was that for conversion.

Plaintiffs' theory was that the defendants, by including certain rebates in the funding and payment

of the settlements, "committed conversion whereby they assumed control and exercised ownership

rights over money belonging to the plaintiffs and appropriated such money for themselves to the

detriment of the plaintiffs." 261 Conn. at 648-49 (internal quotation marks and ellipses omitted).

The Supreme Court held that the defendants' conduct did not fall within the tort of conversion.  The

court began its analysis by saying:

> We have defined conversion as an unauthorized assumption and
> exercise of the right of ownership over goods belonging to another,
> to the exclusion of the owner's rights. . . . The essence of the wrong
> is that the property rights of the plaintiff have been dealt with in a
> manner adverse to him, inconsistent with his right of dominion and
> to his harm. . . . Thus, for the plaintiff's conversion claim to survive
> a motion to strike, the plaintiffs must present a theory of how either
> the rebates, or the money that the defendants allegedly have retained
> through their short-changing scheme, are the plaintiffs' property.

*Id*. at 649 (citations and internal quotation marks omitted).  In the court's view, plaintiffs' conversion

theory failed, for reasons that it is useful to quote at some length:

> An action for conversion of funds may not be maintained to satisfy a
> mere obligation to pay money . . . . It must be shown that the money
> claimed, or its equivalent, at all times *belonged to the plaintiff* and
> that the defendant converted it to his own use.  The requirement that
> the money be identified as a specific chattel does not permit as a
> subject of conversion an indebtedness which may be discharged by
> the payment of money generally. . . . A mere obligation to pay money

9

may not be enforced by a conversion action. . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied. Given that the plaintiffs did not allege that they owned or were ever in possession of the money that, they contended, is currently in the defendants' possession, their conversion claim, as to the rebating scheme, must be stricken. . . . The plaintiffs also did not point to specific, identifiable money to which they had a right of possession. Consequently, the plaintiffs' conversion count regarding the short-changing scheme must be stricken.

*Id*. at 650-51 (citations and internal quotation marks omitted).

In *Deming v. Nationwide Mutual Insurance Co.*, 279 Conn. 745 (2006), plaintiff insurance agents brought actions against defendant insurance companies. Plaintiffs alleged that defendants had wrongfully withheld policy renewal commissions and deferred compensation which were owed to plaintiffs after the termination of their relationships as insurance agents for defendants. The trial court gave summary judgment for defendants, dismissing plaintiffs' claims for conversion and statutory theft. The Supreme Court affirmed. The court cited and quoted its prior opinions in *Hi-Ho Tower* and *Macomber*, recalling the holding in *Macomber* that to sustain a claim for conversion, "It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use." 279 Conn. at 772. To which, the Supreme Court added in *Deming*:

Consistent with this rule, in our case law sustaining a cause of action wherein money was the subject of the conversion or theft, the plaintiffs in those cases at one time had possession of, or legal title to, the money.

Applying this rule to the case at hand, we conclude that the plaintiffs' claims of conversion and theft fail as a matter or law. They have not alleged, nor do they contend in their briefs to this court, that they ever possessed or owned legal title to these funds. At best, the defendants merely are obligated to pay the money. Indeed, although the plaintiffs' affidavits indicate that the funds at issue were held in

10

> separate accounts designated for each plaintiff, under the terms of the contract, the right to those funds did not vest in the plaintiffs until and unless their employment was terminated in accordance with the terms set forth therein.

*Id.* at 772-73 (footnote and citations omitted).

*Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408 (2007), arose out of an auctioneer's alleged conversion and statutory theft for failure to remit the proceeds of sales of items at auction to the seller-plaintiff. The defendant auctioneers conceded that they owed plaintiff a balance of $267,907.67. The trial court gave judgment for the seller on theories, *inter alia*, of common law conversion and statutory theft. The Supreme Court reversed the judgments for conversion and theft. The court concluded that the relationship between auctioneer and seller was that of a debtor and creditor, which barred as a matter of law the seller's claims for conversion and statutory theft. Citing and quoting its decisions in *Macomber* and *Deming,* the Supreme Court said in *Mystic*: "Although our case law is clear that a claim for money, not just tangible goods, may be the subject of conversion or statutory theft, a claim for money owed on a debt is not sufficient to establish such causes of action." 284 Conn. at 421. The court continued:

> Moreover, in order to establish a valid claim of conversion or statutory theft for money owed, a party must show ownership or the right to possess specific, identifiable money, rather than the right to the payment of money generally. A plaintiff must establish legal ownership or right to possession in the particular thing, the specifically identifiable moneys, that the defendant is alleged to have converted. . . . When an action arises from a claim under an express or implied contract, a claim in tort is inappropriate. . . .
> . . . .
> We therefore conclude that Mystic's claims for conversion and statutory theft must fail, in keeping with our precedent barring such claims for money owed.

*Id*. at 421, 429 (citations and internal quotation marks omitted).

*State v. Lavigne*, 307 Conn. 592 (2012), is an appeal from a criminal conviction which posed the question "whether a party who is named as a joint holder of a bank account necessarily is a joint owner of the funds deposited in that account and, therefore, may not be criminally prosecuted for the wrongful withdrawal of those funds." 307 Conn. at 593.  The defendant was convicted of larceny. Affirming the conviction, the Supreme Court held that the trial court properly instructed the jury that the ownership rights in the jointly held accounts presented issues of fact for the jury's determination. The court's analysis of that issue included citations to civil cases, prompting the defendant's objection that "ownership concepts from our civil case law should have no bearing in a matter that concerns criminal  liability." *Id*. at 605 n.10.  The Supreme Court rejected that objection to its own research, stating:

> Moreover, several of the cases cited in this opinion were actions alleging the tort of conversion.  The tort of conversion and the crime of larceny are very similar in that each requires proof that a defendant wrongfully took property owned by another person, although larceny includes an additional element of intent to deprive [citing *Mystic Color Lab* and *Deming*].  The defendant offers no compelling reason why the same element – ownership, or lack thereof  – should be proven differently in the criminal, versus the civil, context.

*Id*.

Instructed by the Connecticut Supreme Court's definitions in these cases of the tort of conversion, I find it difficult to conclude that the conduct of Defendants Bain, Rolls and Neviaser, as alleged by Plaintiff Kopperl, states a viable claim for "conversion of ownership interests," the theory of liability Kopperl asserts in the Fourteenth Count of the TAC.  The gravamen of Kopperl's complaint against these Defendants is that "Kopperl and Bain entered into a contract pursuant to which Bain agreed to convey to Kopperl half of Bain's ownership interest in ARI and half of Bain's

12

ownership in VRS, so that Kopperl would have a 47.5% ownership interest in ARI and a 40% ownership interest in VRS"; "Bain breached his contract with Kopperl," to Kopperl's detriment.  I have quoted from the Sixth Count of the TAC, captioned "Breach of Contract – Stock," against Bain only, Doc. 29, p. 17, ¶¶ 62-64; Rolls and Neviaser came on the scene later, and according to the TAC participated in Bain's continuing wrongful conduct.

If Kopperl succeeds at trial on that contract claim, there is no discernible reason why he could not recover money damages at law or specific performance in equity, both forms of relief being prayed for in the complaint.  Kopperl does not identify in his pleading specific property that he ever possessed and a Defendant thereafter converted to his own use.  The TAC and Kopperl's briefs refer to shares of stock in ARI and VRS, but no shares or share certificates in these companies ever came into Kopperl's possession.  On the contrary: Kopperl's complaint is that this never happened.  If Bain had performed his contractual promise to convey partial ownership interests in ARI and VRS to Kopperl, presumably stock certificates manifesting the conveyances would have issued.  However, that likelihood *in futuro* is not enough to transform  this action for breach of contract, compensable by money damages or remediable by injunctive relief, into one for conversion, as that common law tort has been defined over the centuries.  These several factors all militate against a viable claim for conversion in the case at bar.

The lower court cases cited by the parties in their briefs are not to the contrary.  Plaintiff relies principally upon the decision of District Judge Droney (as he then was) in *Fenn v. Yale University*, No. Civ.A. 3:96-cv-990 (CFD),  2005 WL 327138 (D. Conn. Feb. 8, 2005), *aff'd. on other grounds*, 184 F. App'x 21 (2d Cir. 2006).  What comfort Plaintiff finds in *Fenn* is difficult to discern.  Fenn was a professor of chemistry employed by Yale University, who during the time of

his employment invented and obtained a patent for "a chemical mass spectometry invention" (the

" '538 patent").  2005 WL 327138, at *1.  At the pertinent times, Dr. Fenn was contractually bound

by the University's internal patent policy, which gave Yale the right of first refusal to patent any

faculty inventions.  After a bench trial, Judge Droney found that:

> Dr. Fenn had misrepresented the importance and commercial viability
> of the invention; actively discouraged Yale from preparing and filing
> a patent application while at the same time he was secretly preparing
> a patent application in his own name; filed a patent application in his
> own name without notifying Yale and the NIH; licensed the '538
> invention without notifying Yale and the NIH; and refused to assign
> the '538 patent to Yale when Yale discovered what he had done and
> repeatedly asked that he do so.

*Id*., at *2  (ellipses and brackets omitted).  In these sorry circumstances, Judge
Droney succinctly said,

> Yale established that Dr. Fenn committed all the elements of larceny:
> He acted intentionally to deprive Yale of a patent, the ownership of
> which he knew Yale was entitled to under university policy, by filing
> his own patent application in secret.

*Id*.  Turning to the substantive law of Connecticut, which governed the case, Judge Droney said that

"Dr. Fenn has committed both conversion and statutory theft under Connecticut law," and added:

> Conversion is a lesser included offense of statutory theft, which
> requires a plaintiff to prove the additional element of intent over and
> above what he or she must demonstrate to prove conversion.
> Therefore, a defendant found guilty of statutory theft necessarily also
> committed conversion.
> . . . .
> "In Connecticut, intangible property interests have not traditionally
> been subject to the tort of conversion, except for those intangible
> property rights evidenced in a document." *Hi–Ho Tower v.
> Con–Tronics, Inc.*, 761 A.2d 1268, 255 Conn. 20, 44 (Conn. 2000)
> As a patent is evidenced in a document, it is properly included within
> the tort of conversion.

2005 WL 327138, at *4, *4 n. 9, *4 n. 11 (some citations and internal quotation marks omitted).

14

The differences between *Fenn* and the case at bar are manifest.  The specifically identifiable, nay unique, then-existing document in *Fenn* was the '538 patent.  Dr. Fenn created the patent by procuring its issuance, and then wrongfully converted the patent to his own use by depriving Yale of its ownership right of first refusal, conferred by the University's faculty patent policy.  Fenn profited from that conversion by secretly licensing the patented device for his own benefit, conduct which ultimately resulted in a judgment in Yale's favor against Fenn in excess of $500,000.  There is no counterpart to the '538 patent in the case at bar.

The case at bar is closer on the facts to Superior Court Judge Sheldon's decision in *Garner v. W.R. Berkley Corp.*, No. HHD-cv-0905033428S, 2010 WL 3447880 (Conn. Super. Ct. Aug. 9, 2010).  Plaintiff Garner, an expert in the business aviation field, accepted employment as president and CEO of a corporate aircraft services provider, one of the defendants.  Among its terms, Plaintiff's employment agreement with the corporation "provided the plaintiff stock options 'in the common stock of [Berkley Aviation] that equal one percent (1%) of the outstanding common stock."  2010 WL 3447880, at *2.  The corporate defendant changed its name to Greenwich Aerogroup, Inc.  Plaintiff continued to perform his duties as president and CEO of the renamed corporation.  The complaint alleged that thereafter, the defendant terminated plaintiff's employment without cause.  The plaintiff further alleged that "the defendants breached their duties to him thereunder by failing to grant him stock options equal to one percent (1%) of the outstanding stock of Greenwich Aero."  *Id.*  Plaintiff sought by the action "to recover this alleged equity interest in Greenwich Aero."  *Id.*

Garner's complaint contained a number of counts, only two of which are relevant to the case at bar: claims for conversion and for statutory theft.  It is useful to quote Judge Sheldon's summary of those claims:

In the Seventh and Eighth Counts, alleging conversion and statutory theft, respectively, the plaintiff further alleges that the stock options promised to him by the defendants, but never actually granted to him, rightfully belong to him, and thus that the defendants' refusal to grant them to him has wrongfully deprived him of property belonging to him.   Such wrongful deprivation of his property, without his authorization, allegedly constitutes conversion.  The plaintiff claims in his Seventh Count that he is entitled to recover damages for such conversion because the resulting loss or deprivation of his property has caused him harm.  He claims in his Eighth Count that, because such conversion was intentional, it also constitutes statutory theft, for which he is entitled to recover treble damages under General Statutes § 52-564.

*Id.*

Judge Sheldon granted the defendants' motion to strike these counts.  His careful opinion in

*Garner* cites and quotes the Connecticut Supreme Court's decisions in *Macomber, Mystic Color Lab,*

and *Deming.  Garner*'s quotations from those cases are the same that appear in this Ruling, *supra*.

On the basis of those Supreme Court decisions, Judge Sheldon concluded in *Garner*:

The plaintiff's Complaint expressly alleges that he is entitled to stock options in the common stock of Greenwich Aero pursuant to his Agreement with the defendants.  For this reason alone, his claims of conversion and statutory theft fail as a matter of law and must be stricken.

In addition, the Court must note that the stock options to which the plaintiff claims he is entitled, though definite in quantity, measured as a fixed percentage (1%) of all outstanding common stock of Greenwich Aero, are not definite in identity. That is, they are not particular options for the acquisition of particular shares of Greenwich Aero stock which the plaintiff could somehow identify, by number, date of issuance or otherwise, and thus they are not property which the plaintiff had the right to possess in such a manner, like a specific, identifiable chattel, that another person's interference with that right of possession would constitute conversion. Instead, like a claim for the payment of money generally, the plaintiff's claimed right to be granted the promised stock options as to an undifferentiated quantity of common stock representing one percent (1%) of all

16

> outstanding common stock issued by Greenwich Aero was like a claim for the payment of money generally, which cannot serve as the basis for a conversion action.

*Id.*, at \*5 (citation omitted).  In these circumstances, the court ruled in *Garner* that "the plaintiff has failed to plead a proper claim of conversion, and thus that his Seventh Count, sounding in conversion, and his Eighth Count, sounding in statutory theft based upon alleged conversion, must both be stricken."  *Id.*

The Connecticut trial court in *Garner* understood the Connecticut Supreme Court's rulings in the cited cases, and properly applied those rulings to facts which in all material respects are undistinguishable from those in the case at bar.  Counsel for Plaintiff Kopperl, seeking to avoid the holding in *Garner*, argues that *Garner* involved a promise to deliver stock *options*, while the case at bar involves a promise to transfer "ownership interests" in two companies, presumably to be evidenced by stock *certificates*.  The distinction is factually accurate but legally irrelevant.  Viewing the cases though the prism of decisions like *Macomber*, *Mystic Color Lab* and *Deming*, and the other Supreme Court cases cited *supra*, there is no difference in law between a defendant's breach of an executory contract to make future delivery of stock options  (the *Garner* case) and a defendant's breach of an executory contract to make future transfers of company ownership with attendant stock certificates (the case at bar).  Neither case sounds in common law conversion.  Judge Sheldon's characterizations of the promised stock options in *Garner,* fatal to a claim in conversion, are equally applicable to the promised corporate ownerships in the case at bar.

The discussion need not be extended further.  The decision in *Garner* gives two reasons for striking that plaintiff's conversion claim: (1) the plaintiff's claimed entitlement to stock options was based upon a contract with the defendants; and (2) the promised but undelivered stock options, by

their nature, did not constitute property in the possession of plaintiff, capable of conversion. This reasoning applies squarely to the case at bar: (1) Plaintiff Kopperl bases his claimed entitlement to ownership interests in ARI and VRS upon a contract with Defendant Bain; and (2) the promised but undelivered stock in those companies does not constitute property in the possession of Kopperl, capable of conversion.

This Court agrees with the Connecticut trial court's decision in *Garner*, and concludes that the governing Connecticut law created by the cited Supreme Court cases mandated the conclusion, in *Garner* and the case at bar, that neither plaintiff pleaded a case sounding in conversion. To the extent that lower court cases cited in plaintiff's brief might support a contrary conclusion, I decline to follow them.[4]   Accordingly, the Fourteenth Count in the present Third Amended Complaint, alleging conversion by defendants Bain, Rolls and Neviaser of Kopperl's corporate ownership interests, will be stricken.

### 2.   *Statutory Theft*

The Fifteenth Count of the TAC alleges that defendants Bain, Rolls and Neviaser acted "intentionally to deprive Kopperl" of his ownership interests in ARI and VRS.  Doc. 29, p. 25, ¶ 69. This is alleged to constitute statutory theft under Conn. Gen. Stat. § 52-564, entitling Kopperl to treble damages.

It frequently occurs that a plaintiff couples a claim for conversion with one for statutory theft,

---

[4]   The  two  cases cited by Plaintiff, *Joyce v. TeLog Corp.*, No. 379523, 1997 WL 85245 (Conn. Super. Ct. Feb. 10, 1997) and *Ayers v. French*, 41 Conn. 142 (1874), are not to the contrary. In each case, stock had been issued, was specifically identified, belonged to the plaintiff, and had come into the possession of the defendant, who wrongfully refused plaintiff's demand to return them. Not surprisingly, the courts held that such facts made out a claim for conversion.

both arising out of the same set of facts.  As an example, plaintiff pleaded in this fashion in *Garner*.

In *Deming*, the Supreme Court said: "Conversion can be distinguished from statutory theft . . . in two ways," and continued:

> First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct.  Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion.

279 Conn. at 771(citation and internal quotations marks omitted).

If in order to sustain a claim for statutory theft, when coupled with a claim for conversion arising out of the same facts, a plaintiff must prove "the additional element of intent *over and above* what he or she must demonstrate to prove conversion," it necessarily follows that a plaintiff who cannot prove conversion also cannot prove statutory theft.  *Id.* (emphasis added).  Judge Sheldon reached that common-sense conclusion in *Garner*.  He noted the complaint's Eighth Count claim that "because such conversion was intentional, it also constitutes statutory theft."  2010 WL 3447880, at *2.  That is the theory Kopperl pleads in the case at bar.  The court concluded in *Garner* that plaintiff had not pleaded a claim for conversion, and the claim for statutory theft was stricken with it: "[T]he Court concludes that the plaintiff has failed to plead a proper claim of conversion, and thus that his Seventh Count, sounding in conversion, and his Eighth Count, sounding in statutory theft *based upon alleged conversion*, must both be stricken."  *Id*., at *5 (emphasis added).

I reach the same conclusion in the case at bar.  Since Kopperl's Fourteenth Count is stricken because it fails sufficiently to allege the tort of conversion, and the Fifteenth Count's claim of statutory theft arises out of the same facts and is based upon the alleged conversion, the Fifteenth Count will be stricken together with the Fourteenth Count.

3.     *Tortious Interference with Contractual Relations, and*
       *Tortious Interference with Business Expectancy*

In the Sixteenth and Seventeenth Counts of the TAC, Plaintiff Kopperl asserts claims against

Defendants Rolls and Neviaser only.  The Sixteenth Count alleges  claims for tortious interference

by Rolls and Neviaser with Kopperl's contractual relations with Defendant Bain and the corporate

defendants.  The Seventeenth Count alleges claims for tortious interference by Rolls and Neviaser

with Kopperl's business expectancy, based on those relations.  These tortious interference claims

arise out of the same set of facts.  I discuss them together in this Ruling.

Under Connecticut law as declared by the Connecticut Supreme Court, the elements of a

claim for tortious interference with contractual relations are substantially similar to the elements of

a claim for tortious interference with business expectancies.  *Compare Appleton v. Bd. of Educ.*, 254

Conn. 205, 212-13 (2000) (contractual relations) and *Am. Diamond Exch., Inc. v. Alpert*, 302 Conn.

494, 510 (2011) (business expectancies).  Historically, these are related but separate torts, as the

Supreme Court explained in *Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747 (1984):

> The common law has long countenanced a cause of action sounding
> in tort for interference with another's business practices and
> opportunities.  Originally the cause of action was recognized in suits
> where a defendant was alleged to have interfered with the plaintiff's
> advantageous contractual relations.  Gradually, perhaps in recognition
> of an increasingly competitive business climate, the law came to
> recognize that a merchant might have protectible interests even in
> business expectations that had not been confirmed by contract. . . .
> . . .
> In order to succeed on a claim of tortious interference with
> business expectancies, however, the plaintiff must do more than show
> that the defendant's actions proximately caused a loss to the plaintiff's
> business.  A cause of action for tortious interference with a business
> expectancy requires proof that the defendant was guilty of fraud,
> misrepresentation, intimidation or molestation; or that the defendant
> acted maliciously.

192 Conn. 753-54 (citations and internal quotation marks omitted).

More recently, the Supreme Court said: "A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was cause[d] by the defendant's tortious conduct." *Rioux v. Barry*, WITH , 351 (2007) (citation omitted).

Central to these claims is the requirement that to be actionable, the *interference* complained of must be *tortious*. In an ostensibly practical and sensible world, it could not be otherwise. Our relations and expectancies in life are constantly interfered with by others. That is an inevitable consequence of living in a competitive world, among people whose ambitions, hopes or purposes may match or conflict with our own. If we could file a civil action against anyone who interfered with our contractual relations or business expectancies, the courts would have no time to do anything else. The saving limitation, embedded in the common law, is found in the rule that only a tortious interference is actionable. The Supreme Court stated that rule forcefully in *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 208 Conn. 525 (1988):

> This court has long recognized a cause of action for tortious interference with contract rights or other business relations. Nevertheless, not every act that disturbs a contract or business expectancy is actionable. For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation or that the defendant acted maliciously. An action for intentional interference with business relations requires the plaintiff to plead and prove at least some improper motive or improper means. A claim is made out only when interference resulting in injury to another is

21

wrongful by some measure beyond the fact of interference itself.

208 Conn. at 535-36 (citations, internal quotation marks, ellipses and brackets omitted).

The Supreme Court's phrasing in *Weiss* suggests, by use of the disjunctive "or," that a defendant may have been free of guilt of "fraud, misrepresentation, intimidation or molestation," and still have "acted maliciously."  In *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 806 (1999), the Supreme Court said: "The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." (citation and internal quotation marks omitted).  The relative ease with which a court draws such a distinction – between "malice" (actionable) and "ill will" (not actionable) – belies the difficulty in drawing the line between the two.   That difficulty is pronounced in a case such as the one at bar, where an individual interfered with is required to characterize in his pleading the conduct of the interferer.  If a person's important relationships  or expectations have been interfered with by another, it is natural for that person to regard the other as malicious, rather than motivated by simple ill will or bad manners.  Just as beauty may lie in the eye of a beholder, malice may lie in the sensibility of a victim.

In the case at bar, these factors must be viewed through the prism of Defendants' Rule 12(b)(6) motion to dismiss the Sixteenth and Seventeenth Counts.  The decisive question is whether the factual allegations of those counts state claims for tortious interference, as that tort is defined by the law of Connecticut.  *See Weiss*, 208 Conn. at 536-37: "The plaintiff's complaint omits the necessary allegation of improper motive or means. . . . Because the plaintiff's complaint failed to plead allegations essential to an action for tortious interference with a contractual  relationship, the trial court erred in awarding the plaintiff a recovery on that basis."

22

The standards of review for dismissal of a complaint under Federal Civil Rule 12(b)(6), recently clarified by decisions of the United States Supreme Court, are now well established.  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  The Supreme Court continued in *Iqbal*:

> [T]he pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers  "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Nor does as complaint suffice, if it tenders "naked assertions" devoid of "further factual enhancement." . . . .

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of "entitlement to relief." . . . .

> [T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation." . . . [O]nly a complaint that states a plausible claim survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

556 U.S. at 678-679 (citing and quoting *Twombly*; other citations and internal quotation marks

23

omitted).   The Supreme Court's holdings and reasoning in *Twombly* and *Iqbal* are consistently applied by the Second Circuit in subsequent cases; *see, e,g,*, *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

Applying these standards to the case at bar, the question becomes whether the Sixteenth and Seventeenth Counts of Kopperl's Third Amended Complaint allege plausible claims against Rolls and Neviaser for tortious interference with contractual relations and tortious interference with business expectancy.   The Court must carefully consider the allegations relevant to those claims. They are found in ¶¶ 1-61 of the TAC, which are realleged at the beginning of each count, and in the separate allegations contained in each of the two counts under consideration.   The recitation immediately following is taken from those allegations.

John Rolls is a citizen of New York and resides in Armonk, N.Y.   Lawrence A. Neviaser is a citizen of Maryland, and resides in Easton, Maryland.   Neviaser has provided management services in Connecticut to ARI and VRS, either as an independent contractor or as an employee of ARI and/or VRS.

As noted in the Court's decision in *Kopperl I*, 2010 WL 3490980 at *1, "in early 2006, Kopperl and Bain discussed the possibility of Kopperl becoming a partner in the business conducted by ARI and VRS."   Those discussions contemplated Kopperl acquiring 50% of Bain's ownership interest in ARI and 50% of Bain's ownership in VRS.   On November 3, 2006, Kopperl signed and returned to Bain a Letter Agreement providing for those acquisitions. (Bain denies having signed that document; *see Kopperl I* at *1).   In any event, in July 2006 Kopperl became an employee of ARI and VRS, and rendered services to those companies as an employee.   The case for Kopperl is that as a result of his agreements with Bain, Kopperl had acquired a 47.5% ownership interest in ARI and

24

a 40% ownership interests in VRS.  Over time, Kopperl has paid Bain a total of $425,000 for those acquisitions.  In 2006, 2007 and 2008, federal corporate income tax returns were filed for ARI and VRS, which recited that Kopperl owned 47.5% of ARI and 40% of VRS.

In October 2009, Bain terminated Kopperl's employment with ARI and VRS.  Bain denies in this litigation that Kopperl ever acquired ownership interests in ARI or VRS.

Rolls and Neviaser came on the scene in the spring of 2009.  In May 2009, Bain received a draft letter of intent from Neviaser, indicating Neviaser's wish to acquire a 10% ownership interest in ARI and a 10% ownership interest in VRS from Bain.  Nothing came of that proposal.  Neviaser and Rolls then prepared a joint proposal, dated June 8, 2009, addressed to Kopperl, for them to purchase Kopperl's 47.5% ownership interest in ARI and 40% interest in VRS.  Kopperl declined to accept that proposal by Rolls and Neviaser.

In September, 2009, Bain and Rolls executed a letter of intent for conveyance to Rolls of ownership interests in ARI and VRS.  Bain and Rolls also executed a stock purchase agreement, effective as of September 11, 2009, for conveyances of a 23.75% ownership interest in ARI and a 20% ownership interest in VRS.  On September 15, 2009, Rolls made an initial payment of $250,000 by wire transfer to Bain for acquisition of those ownership interests.

On October 27, 2009, Bain executed with Neviaser a letter of intent and a stock purchase agreement, for conveyances to Neviaser of a 10% ownership interest in ARI and a 10% ownership interest in VRS.

On March 12, 2010, Bain caused the issuance to Rolls and Neviaser of stock certificates in ARI and VRS which reflected the ownership interests previously agreed upon.  At all these times, Rolls and Neviaser knew that Kopperl "owned a 47.5% ownership interest in ARI and a 40%

ownership interest in VRS," TAC ¶ 36, but Kopperl was given no notice of the negotiations and eventual agreements between Bain, Rolls and Neviaser.  The understanding of Rolls and Neviaser, that Kopperl had ownership interests in ARI and VRS, would seem to be reflected by the allegation that in June 2009, Rolls and Neviaser sent Kopperl a proposal to purchase Kopperl's 47.5% interest in ARI and 40% interest in VRS, which Kopperl rejected.

The TAC alleges in ¶ 72 of the Sixteenth Count (tortious interference with contractual relations)  that "[i]n executing these letters of intent, and purporting to acquire ownership interests in ARI and VRS as alleged above, Rolls and Neviaser intended to interfere with Kopperl's contractual relationship with Bain as set forth in the Letter Agreement, and with Kopperl's employment at ARI and VRS."  That intention to interfere, the TAC goes on to allege in ¶¶ 73-77, is evidenced by a number of statements Rolls or Neviaser directed to Bain, in letters or e-mails.

The following statements are attributed to Rolls: "I believe you [Bain] have no obligation to disclose any of this to Andrew [Kopperl]"; "Andrew should know nothing of this transaction [conveyance of ARI and VRS stock to Rolls] before it happens and the identity of the buyer [Rolls] after completion"; "As a 24% holder Andrew will have no power to influence the future conduct of the business [of ARI and VRS]"; "Should he [Andrew Kopperl] behave badly, it will be fully in our power (you [Bain], Larry [Neviaser] and I [Rolls] ) to dismiss him as an employee and deny him access to the company's facilities"; "The finance/administrative work performed by Andrew [Kopperl] can easily be replaced and I agree to oversee bookkeeping and financial reporting"; "We both agreed not to disclose any of this to anyone (wives excluded) except Larry [Neviaser] whom we agreed I shall contact"; and "Should Andrew [Kopperl] elect to pursue legal action I have agreed to cover the cost of any litigation."  Doc. 29, p. 27, ¶ 73(a)-(g).

26

The following statements are attributed to Neviaser: "I am not sure I want to invest in a company in which he [Kopperl] is a partner"; "Andrew [Kopperl] has done you no favors as far as implementing sound business practices and he clearly has limited skills with people"; "He [Kopperl] is emotionally unstable, not a particularly good businessman, and he is not helpful to the future of the business";  "I think Andrew [Kopperl] is bad news and your situation with him will only get worse until you get out of it sooner rather than later"; "I have serious concerns about how we are going to continue to all work together and keep the focus on business and what we need to do to move it forward"; "[This is]  an unhealthy situation at best and clearly one that is not sustainable in the long run"; "Having started this ball rolling, I don't think there is any going back and there will be some tough decisions coming up pretty quickly"; and "I'm sure you know that I will provide any and all assistance to you in achieving a positive outcome."  *Id.*, p. 28-29, ¶ 76(a)-( d), ¶ 77 (a)-(d). The last four quoted statements were contained in an email Neviaser sent to Bain on September 26, 2009.  Bain terminated Kopperl's employment at ARI and VRS on October 13, 2009.  *Id.*, p. 29, ¶ 78.

Kopperl sums up and characterizes these statements by Rolls and Neviaser by alleging in ¶ 79: "The intent of Rolls and Neviaser to interfere with Kopperl's contractual relationship with Bain, and with Kopperl's employment was malicious, in that they caused such interference with improper motive and without justification."

The allegations in the Seventeenth Count (tortious interference with business expectancy) track those of the Sixteenth Count, and need not be separately stated in this Ruling.

For purposes of Rule 12(b)(6) analysis, I disregard Kopperl's allegation that the intent of Rolls and Neviaser to interfere with Kopperl's contractual relationship with Bain, and by extension

with Kopperl's resulting business expectations, was "malicious." That is a legal conclusion, couched in the form of an allegation of fact. The question is whether the properly pled allegations of fact in the complaint make out a plausible claim of a common law tort of interference by these defendants (with contract relations or business expectations).

As noted *supra*, for interference to be actionable it must have been *tortious*. That element requires proof that "the defendant was guilty of fraud, misrepresentation, intimidation or molestation, or that the defendant acted maliciously." *Weiss*, 208 Conn. at 535. In the case at bar, there is no allegation that Rolls or Neviaser were guilty of "fraud, misrepresentation, intimidation, or molestation," as those unpleasant nouns are used in the law. The question thus becomes: Do the Sixteenth and Seventeenth Counts of Kopperl's Third Amended Complaint sufficiently plead a plausible claim that Rolls and Neviaser acted with malice, to Kopperl's detriment?

The case, as Kopperl alleges it, comes down to this. Rolls and Neviaser were apparently men of some means. In early 2009, they formed the desire to invest (individually, and then together) in those specialty automotive restoration and servicing companies known as ARI and VRS. In May 2009, Neviaser attempted to buy 10% of each company from Bain. Bain turned him down. In a proposal dated June 8, 2009, Rolls and Neviaser, acting together and with the apparent belief that Kopperl owned part of ARI and VSR, attempted to buy Kopperl's interests in the companies. Kopperl turned them down.

Rolls and Neviaser reacted promptly to that commercial disappointment. On June 24, 2009, Neviaser sent Bain an e-mail, quoted *supra*, that was strongly and personally critical of Kopperl – "emotionally unstable, not a particularly good businessman, and he is not helpful to the future of the business" – and included the not surprising warning: "I am not sure I want to invest

28

in a company in which he [Kopplerl] is a partner." Doc. 29, p. 28, ¶ 76(a), (c).  On September 26, 2009, Neviaser followed up with another e-mail to Bain, reiterating his criticism of Kopperl and predicting trouble for the companies if Kopperl continued to participate in them: this is "an unhealthy situation at best and clearly one that is not sustainable in the long run," "there will be some tough decisions coming up pretty quickly," and "I will provide any and all assistance to you in achieving a positive outcome." *Id.*, p. 28-29, ¶ 77 (b)-(d).

Rolls weighed in with a letter of intent to Bain dated September 11, 2009, urging that Kopperl be told nothing about the transfer of company stock to Rolls and Neviaser, opining that Kopperl "can easily be replaced," and undertaking "to cover the cost of any litigation" if Kopperl elected to file suit.  *Id.*, p. 27, ¶ 73 (e),(g).

On October 13, 2009, Bain terminated Kopperl's employment at ARI and VRS, and soon thereafter locked him out of the company buildings and instructed company employees not to communicate with Kopperl.  *Id.*, p. 29, ¶ 78.

This narrative, derived from well-pleaded factual allegations whose truth I must accept on this motion to dismiss, allows the plausible inferences that in early 2009, Bain needed an infusion of additional capital at ARI and VSR; Rolls and Neviaser were in a position to invest in the companies, but would do so only if they could obtain Kopperl's ownership interests (which Kopperl had refused to sell to them); Rolls and Neviaser thereupon addressed a series of communications to Bain, denigrating Kopperl personally and professionally, and making it plain that Kopperl would have to be removed from the companies before Rolls and Neviaser would invest in them; and Bain yielded, abruptly firing Kopperl and locking him out of the company building as he departed.  The speed with which Kopperl fell from grace seems somewhat surprising, given that according to the

complaint's allegations, Kopperl had been steadily employed at ARI and VRS since July 2006, and in 2006, 2007, and 2008 Kopperl had been identified in the companies' tax returns, presumably with Bain's knowledge and approval, as a part owner of the companies.

These events, culled from the allegations of the amended complaint, would fall short of qualifying Rolls or Neviaser for an award for business ethics or morality. But does the alleged conduct of these defendants rise to the level (or perhaps more precisely, sink to the depth) of malice? The question of malice *vel non* is fact-intensive. The precedential value of particular cases is limited. However, decisions of the Connecticut Supreme Court give trial judges important guidance.

In *Weiss*, 208 Conn. 525, the corporate plaintiff, Robert S. Weiss and Associates, Inc., was an independent insurance agency which at one time employed defendant Michael Wiederlight to sell commercial insurance. The contract contained a restrictive covenant which came into effect if and when Wiederlight left Weiss's employ. Weiss declined to renew Wiederlight's employment contract when it expired. Wiederlight was immediately hired by Insurance Associates of Connecticut, Inc. (IAC), a competitor of Weiss, and Wiederlight "began to solicit and sell commercial insurance policies to customers he had dealt with while working for Weiss." 208 Conn. at 528. The Supreme Court further noted: "Before hiring Wiederlight, the principals of IAC had reviewed his employment agreement with Weiss and were aware of the terms of the restrictive covenant. . . . The principals of IAC encouraged and induced Wiederlight to sell insurance to customers of the plaintiff and others in the Stamford area despite their knowledge of the restrictive covenant in Wiederlight's 1979 employment agreement with Weiss." *Id*.

In these circumstances, Weiss sued Wiederlight for breach of the restrictive covenant and theft of trade secrets. Weiss also sued IAC, "alleging interference with a business enterprise and

30

theft of trade secrets with Wiederlight acting as its agent." 208 Conn. at 526. In that part of its opinion relevant to the case at bar, the Supreme Court considered the count in Weiss's complaint that alleged IAC's conduct "constituted an interference with a contractual relationship," *id*. at 535, and set aside the trial court's judgment against IAC for tortious interference with contract. It is instructive to quote the Supreme Court's reasoning on that point:

> The plaintiff's complaint omits the necessary allegation of improper motive or means. The assertion that IAC "encouraged" Wiederlight to sell commercial insurance in the restricted area when it knew or should have known of the covenant's terms does not fairly imply that IAC acted with "fraud, misrepresentation, intimidation or molestation" or that it acted with malice. Construing the allegations most favorably to the pleader[,] the most the complaint alleges is that IAC knew of the covenant's terms when it hired Wiederlight. We have stated in an analogous situation, "to raise an allegation of wilful conduct, the plaintiff must clearly plead that the harm was caused by the wilful or malicious conduct of the defendants." . . .

> Because the plaintiff's complaint failed to plead allegations essential to an action for tortious interference with a contractual relationship, the trial court erred in awarding the plaintiff a recovery on that basis.

*Id*. at 536-37 (citations, internal quotation marks, and footnote omitted). In the case at bar, defendant Rolls and Neviaser place principal reliance upon the Supreme Court's decision in *Weiss*.

The ultimately unsuccessful plaintiff in *Weiss* defended the sufficiency of its tortious interference complaint by relying upon the Supreme Court's decision in *Solomon v. Aberman*, 196 Conn. 359 (1985). The *Weiss* court distinguished *Solomon* for reasons stated at 208 Conn. 535 n. 6. That footnote observes that the plaintiff in *Weiss* cited *Solomon* "for the proposition that conscious interference with a contract for the purpose of financial gain constitutes an improper purpose." *Solomon*, an action for tortious interference, arose in the context of the plaintiff's application for a prejudgment attachment, which required the trial judge to conduct a statutory

31

probable cause hearing into the question of whether "the defendants had committed tortious interference with the plaintiff's contractual and beneficial relations." *Weiss,* 208 Conn. 535 n.6.  The Supreme Court in *Weiss* said of its decision in *Solomon*:

> We upheld the trial court's finding of probable cause after noting that the court found that the defendant obtained an indirect financial benefit by improperly inducing the plaintiff's discharge from employment. In the present case, the plaintiff's complaint does not allege any affirmative conduct by IAC analogous to the improper conduct of the defendant in Solomon.

*Id*. (citation omitted).

The facts in *Solomon* are deserving of closer attention because in that case the Supreme Court considered the pleadings and probable-cause evidence sufficient to support a claim for tortious interference, whereas in *Weiss* the pleadings were insufficient.  *Solomon*'s circumstances are more fully stated in the Supreme Court decision in the case itself, *Solomon v. Aberman*, 196 Conn. 359 (1985).  Plaintiff Solomon had been the salaried executive director of the Hall-Brooke Foundation, and a lifetime (purportedly) member of Hall-Brooke's board of trustees.  Solomon's removal from these positions was engineered by the two defendants in the case: Aberman, Hall-Brooke's acting executive director during Solomon's trustee-approved leave of absence from that post, and Levett, a partner in the law firm of Cummings & Lockwood, that had represented the Hall-Brooke until the board of trustees fired Solomon as executive director and appointed Aberman in her place.

The evidence at the probable cause hearing, reviewed by the Supreme Court in painstaking detail, was of a nature to prompt the trial judge to say that defendant Levett "tortiously interfered with the plaintiff's contractual relations for the purpose of benefitting himself"; to that end, at the board meeting in question "he pointed the gun which he had loaded with the ammunition furnished

by the defendant Ms. Aberman." 196 Conn. at 374.  The trial judge concluded that "Levett's 'motive for engineering the plaintiff's discharge' was the 'advantage' he received when Hall-Brooke retained Levett's newly founded law firm as its counsel rather than Cummings & Lockwood."  *Id*. at 373. As for defendant Aberman, the trial judge attributed to her "the 'strong motive' that the plaintiff's discharge would and did lead to the retention of Aberman, rather than the plaintiff, in the post of executive director beyond the term her original contract was to end."  *Id*. at 372.

Aberman and Levett accomplished the discharge of Solomon by arranging and manipulating the materials presented to the trustees at the board meeting which resulted in a vote to fire Solomon. Aberman's actions in that regard, the trial judge found, "were taken in bad faith and negligently," consisting in crucial part of Aberman writing memos about Solomon's performance intended 'to harass and humiliate the plaintiff by the tone and content of her memos'; . . . it was 'clear that the basis for the plaintiff's discharge were the memos written [by her] and selected by her and given to Levett for compilation and organization.'"  196 Conn. at 372-73 (ellipsis omitted).  The trial judge further concluded that attorney Levett, thus armed, "convinced the Directors that they were within their rights to fire the plaintiff in the manner in which they did and that, in fact, her contracts with the Foundation were probably invalid."  *Id*. at 374.

In these circumstances, the trial court held that probable cause existed to believe that Solomon had a viable claim against Aberman and Levett for tortious interference with Solomon's contract relations and business expectations, and granted Solomon's application for a prejudgment remedy.  The Supreme Court, in affirming, held that the trial judge's factual findings were permissible and his conclusions correct.  The relevance of *Solomon* to the case at bar is that, in the view of the Connecticut Supreme Court, *Solomon* furnishes an example of circumstances that make

33

out a claim for tortious interference. *Weiss* furnishes an example of circumstances that do not.

On a motion to dismiss, in *Iqbal* the United States Supreme Court instructs trial judges to take all the factual allegations in the complaint as true. In *Weiss* the Connecticut Supreme Court instructs trial judges to construe the complaint's allegations most favorably to the pleader. Having performed those mandated functions in the case at bar, I conclude without difficulty that the alleged conduct of Rolls and Neviaser, charged by Kopperl with tortious interference in the case at bar, is more closely analogous to the conduct of Aberman and Levett, the accused interferers in *Solomon*, than it is to that of IAC, the accused interferer in *Weiss*.

Elisabeth Solomon, the plaintiff in the case bearing her name, was established as the executive director of a foundation when she was targeted by Aberman and Levett, who combined to denigrate Solomon's performance and character, orchestrated a board meeting which voted to discharge Solomon, and personally benefitted from Solomon's removal: Aberman by succeeding Solomon as executive director, and Levett by succeeding his former law firm as retained counsel for the foundation. In the case at bar, Andrew Kopperl had been employed at the automotive companies in question for several years before he rejected Rolls' and Neviaser's proposal to purchase his ownership interests in the companies; Kopperl then found himself targeted by Rolls and Neviaser, who denigrated his performance and character to Bain, and successfully urged Bain to discharge Kopperl, as a condition for Rolls' and Neviaser's investment in the companies; and, with Kopperl discharged and locked out, Rolls and Neviaser acquired their desired benefits: ownership interests in the companies. The similarities between these two scenarios are striking. That is not the case at all with *Weiss*, where the conduct of IAC, the accused tortious interferer and a business competitor of plaintiff, consisted of nothing more than hiring the plaintiff's former employee with knowledge

of the restrictive covenant between those two and encouraging the employee to breach it.  Nobody in *Weiss* lost a job or prestigious position of trust because of deliberate conduct intended to inflict that precise harm upon the deposed individual.  That is what happened in *Solomon*.  That is what Kopperl alleges happened to him in this case.

My task on the present motion is to decide whether Kopperl's complaint "states a plausible claim for relief" for harm inflicted upon him by tortious interference on the part of Rolls and Neviaser.  *Iqbal*, 556 U.S. at 679.  The Supreme Court goes on in *Iqbal* to say that the making of that determination "requires a reviewing court to draw on its judicial experience and common sense," *id.*, a touching affirmation by the High Court that a lower court such as this one has either quality.  In the case at bar,  Connecticut Supreme Court authority and common sense combine to permit, if not compel, the conclusion that the conduct of Rolls and Neviaser *vis-a-vis* Kopperl was malicious.  In consequence, the Sixteenth and Seventeenth Counts of the Third Amended Complaint allege plausible claims for tortious interference, and the defendants' motion to dismiss those counts will be denied.[5]  Whether Kopperl can establish these facts by proof, through discovery and plenary trial, is of course a different question.  Rule 12(b)(6) practice is concerned only with the sufficiency of pleadings.

**4.    *Civil Conspiracy***

The Eighteenth Count of the TAC is captioned as a claim of "civil conspiracy as to Rolls and

---

[5]    The  able  briefs of counsel cite  a  number of Connecticut lower court decisions, each turning upon its particular facts.  Some result in conclusions of tortious interference, others do not.  Those cases cannot be fully reconciled.  They do not have the effect of altering this Court's conclusion in this case, as expressed in text.

Neviaser."  Doc. 29, p. 31.

Notwithstanding that limiting caption, the allegations in this Count, particularly ¶ 92 through ¶ 93 (including two paragraphs numbered "93"), appear to assert that Bain was a member of the claimed conspiracy.  The underlying facts are those alleged in the other counts.  Paragraph 92 alleges that Rolls and Neviaser schemed "to interfere with Kopperl's contractual relations with Bain, to interfere with Kopperl's business relationship with Bain, and to interfere with Kopperl's employment at ARI and VRS."  The first ¶ 93 alleges that Bain, Rolls and Neviaser schemed "to effect the conversion and theft of Kopperl's ownership interests in ARI and VRS."  The second ¶ 93 alleges: "As a result of the civil conspiracy of Rolls, Neviaser, and Bain, as alleged above, Kopperl has suffered monetary damages, for which Rolls, Neviaser, and Bain are each jointly and severally liable."  Kopperl's brief on this motion mentions only Rolls and Neviaser by name in connection with the civil conspiracy count.

I need not pursue this uncertainty further because it is apparent that whoever Plaintiff intends to identify as conspirators, the claim for civil conspiracy must be stricken.  *Conspiracy* usually falls within the purview of the criminal law.  An action for civil conspiracy exists under Connecticut law, but it is a limited one.  The elements of "a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme  and in furtherance of the object, (4) which act results in damage to the plaintiff."  *Marshak v. Marshak*, 226 Conn. 652, 665 (1993), *overruled on other grounds*, *State v. Vakilzaden*, 251 Conn. 656 (1999).  The template for those elements is found in the criminal law.  The elements articulated in *Marshak* echo a trial judge's charge to a jury in a criminal case about the elements of a criminal conspiracy.

36

In the case at bar, Kopperl argues that the second element, a combination of persons to do a criminal or unlawful act, is satisfied by the defendants' alleged theft of Kopperl's ownership interests in ARI and VRS.  That argument is no longer available to Plaintiff because his claim for statutory theft is dismissed for the reasons stated in Part II.B.2., *supra*, together with the claim for conversion, Part II.B.1.  The claims which survive dismissal are Kopperl's claims against Bain for misrepresentation, breach of contract, breach of fiduciary duty, and violation of certain non-criminal Connecticut statutes, and his claims against Rolls and Neviaser for tortious interference.  Those allegations, while sufficient to state civil claims for damages, do not plead a criminal or unlawful act of a nature sufficient to satisfy the second necessary element of a claim for civil conspiracy.  *Cf. Diette v. Dental Group of Norwalk*, No. CV 970158747, 1998 WL 97694, at *3 (Conn. Super. Ct. Feb. 27, 1998), where the court struck a claim for civil conspiracy:  "The fact that the defendant may have conspired with others to 'deprive' the plaintiff 'of his ownership interest' in the defendant Group does not, in itself, necessarily rise to the level of an unlawful act."[6]

The motion to dismiss the Eighteenth Count in the Third Amended Count will be granted.

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion [Doc. 36] to dismiss certain counts in Plaintiff's Third Amended Complaint [Doc. 29] is decided by the Court as follows:

1. The motion to dismiss the Fourteenth Count, Fifteenth Count, and Eighteenth Count, for failure to state a claim upon which relief can be granted, is GRANTED, without leave to amend.

---

[6]   *See also Bernbach v. Timex Corp.*, 989 F. Supp. 403, 409 (D.Conn. 1996) (holding in *Marshak* "underscores that *unlawful* acts are a necessary predicate to an action for civil conspiracy") (emphasis in original).

2.  The motion to dismiss the Sixteenth Count and the Seventeenth Count, for failure to state a claim upon which relief can be granted, is DENIED.

3.  The motion to dismiss the Third Count, Fourth Count, Fifth Count, Sixth Count, Seventh Count, Eighth Count, Ninth Count, Tenth Count, Eleventh Count, and Twelfth Count, for failure to allege sufficiently the nature or amount of claimed damages, is GRANTED, with leave to amend. The motion to dismiss the Thirteenth Count on that ground is DENIED.

The Court grants or withholds leave further to amend the Complaint in the exercise of its discretion.  Leave to amend is denied when it is apparent that a pleaded claim fails under the governing substantive law, in a manner that additional factual allegations will not cure.  Leave to amend is granted when deficiencies in a pleading may be cured by additional factual allegations, as in the case (for example) of the failure of a complaint to allege fraud with the particularity required by Fed. R. Civ. P. 9(b).  In the case at bar, the counts referred to in Paragraph 1 of Part III fall within the first of these principles, and the counts referred to in Paragraph 3 fall within the second.

If Plaintiff decides to further amend his Complaint in a manner consistent with this Ruling, the amended pleading must be filed on or before **June 27, 2014.**  In drafting an amended pleading, Plaintiff must be mindful of the strictures of Fed. R. Civ. P. 11.

All of the foregoing is SO ORDERED.

Dated:   New Haven, Connecticut
         June 2, 2014


                                    */s/Charles S. Haight, Jr.*
                                    CHARLES S. HAIGHT, JR.
                                    Senior United States District Judge

38